## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

JON GERMAIN and AMBER RHY, on
behalf of themselves and all others similarly
situated,

                    Plaintiffs,

v.

BANK OF AMERICA, N.A.,

                    Defendant.             Case No. 13-cv-00676 (BBC/SLC)

## BRIEF OF PLAINTIFFS JON GERMAIN AND AMBER RHY IN SUPPORT OF RENEWED MOTION TO CERTIFY A CLASS

## I.      INTRODUCTION

Defendant Bank of America, N.A. (hereinafter "Defendant") instituted a number of practices to attempt to shield itself from losses in the financial crisis.  Several of Defendant's practices involved obtaining credit reports on consumers without regard to whether those consumers were Defendant's current or aspiring customers.  Defendant's loss prevention practices violated the Fair Credit Reporting Act's (FCRA) prohibition on obtaining consumer reports on individuals without a permissible purpose.

Plaintiffs Jon Germain (hereinafter "Plaintiff Germain") and Amber Rhy (hereinafter "Plaintiff Rhy") (hereinafter, collectively, "Plaintiffs") were subjected to one or more of Defendant's illegal loss prevention practices.  Because Defendant's illegal practices were directed at large segments of consumers based on criteria common to all, Plaintiffs seek to

represent classes of similarly situated consumers (the instant "Motion").  For the reasons that follow, the Court should grant the Motion.

## II.   PROCEDURAL BACKGROUND

Plaintiffs started this action on September 26th, 2013 after learning of suspicious inquiries of their credit information[1] by Defendant.  (*See* Class Action Complaint ("CAC") ¶¶ 11, 17 [Dkt. # 1]).  Defendant's credit inquiries were reported to Plaintiffs by national consumer reporting agency Trans Union LLC (hereinafter "TransUnion").   (*See* CAC ¶¶ 11, 17.)  Plaintiffs had discharged debts to Defendant in bankruptcy prior to Defendant's inquiries.   (*See id.* ¶¶ 11-12, 16–18.)  Plaintiffs claimed that the bankruptcy discharges severed their relationships with Defendant; at least, Plaintiffs claimed that the discharges eliminated the type of relationships that would give Defendant a permissible purpose to obtain their credit information from TransUnion.  (*See id.* ¶ 53.)

Plaintiffs were joined in their original pleading by a number of other consumers, and together sought to represent absent consumers with similar claims.  (*See* CAC ¶¶ 4, 6–9, 44–50.)  To that end, Plaintiffs filed a motion to certify a class along with their original pleading.  (*See* Mot. Cert. Class [Dkt. # 2].)  The Magistrate Judge entered an order on October 9th, 2013 extending the briefing schedule on class certification so that the issue

---

[1] A "consumer report" subject to the FCRA's permissible use and disclosure restrictions is "any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living."  *See* 15 U.S.C. §§ 1681a(d)(1) and 1681b

would be briefed and decided after a case scheduling conference and time for discovery. (*See* Text Ord. Oct. 9, 2013 [Dkt. # 9].)

Defendant then filed a motion to dismiss the entire case on November 18th, 2013. (*See* Mot. Dismiss [Dkt. # 17].)  After considering some facts and arguments raised by Defendant, Plaintiffs filed an amended pleading on December 20th, 2013.  (*See* Amended Class Action Complaint ("ACAC") [Dkt. # 26].)  Plaintiffs' amended pleading alleged additional facts regarding their relationships (or lack of relationships) to Defendant and included fewer individual claimants (and putative class representatives).  (*See* ACAC ¶¶ 3–6, 8–22.)  Defendant then directed a second to motion to dismiss at Plaintiffs' amended pleading.  (*See* Sec. Mot. Dismiss [Dkt. # 30].)  Plaintiffs' two other co-claimants in the amended pleading dismissed their claims against Defendant by stipulation, leaving Plaintiffs' claims as the sole claims at issue.  (*See* Stip. Dismiss [Dkt. # 33].)  Plaintiffs opposed Defendants' second motion to dismiss through a responsive brief filed January 22nd, 2014.  (*See* Pls.' Opp. Br. [Dkt. # 34].)

The Court denied Defendant's motion to dismiss on April 2nd, 2014.  (*See* Ord. Apr. 14, 2014 [Dkt. # 36].)  The Court recognized that Plaintiffs' bankruptcy discharges eliminated the personal liability to Defendant that would ordinarily be sufficient to justify an "account review" inquiry of a consumer's credit file.  (*See id.* at 5.)  The Court considered other potentially sufficient justifications proffered by Defendant but found them not properly before the Court on the motion to dismiss.  (*See id.* at 6–7.)  Ultimately, the Court decided that Defendant's actual purpose for obtaining Plaintiffs' credit files was a fact issue for a discovery, with analysis of legal consequences to follow.  (*See id.* at 7.)

3

After the Court denied Defendant's motion, the parties conferred to attempt to schedule the discovery necessary to uncover Defendant's purposes or purposes for obtaining their credit files and to explore the suitability of Plaintiffs' claims for class treatment. (*See* Stip. Ext. Time May 16th, 2014, ¶¶ 4–7 [Dkt. # 37].) By mid-May, the parties had identified the need to, at minimum, conduct depositions of witnesses in California and North Carolina. (*See id.*) The parties contemplated that further discovery might also be necessary. (*See id.*) By order entered May 27th, 2014, the Magistrate Judge denied the parties' request to extend the deadline for Plaintiffs to renew their class certification motion to August 15th, 2014 but agreed to extend the deadline to June 27th, 2014. (*See* Text Ord. May 27, 2014 [Dkt. # 38].) The parties successfully completed the California and North Carolina depositions, and additional follow-up discovery to TransUnion has been served. (*See* Lyons Decl. June 27, 2014, ¶ 2, Ex. 1, Not. Subpoena to TransUnion (hereinafter "TU Subpoena.") Plaintiffs now bring this timely Motion.

## III.   FACTUAL BACKGROUND

As the Court has previously taken notice, Plaintiff Germain owed a mortgage debt to a company acquired by Defendant and discharged that debt in bankruptcy on February 19th, 2009. (Ord. Apr. 2nd, 2014, at 2–3.) Plaintiff Rhy owed a mortgage debt to a company acquired by Defendant and discharged that debt in bankruptcy on February 18th, 2010. (*Id.* at 3–4.)

Defendant obtained credit information about Plaintiff Germain from TransUnion at least six times in 2012.[2]  Defendant's inquiries of Plaintiff Germain's credit information were posted to TransUnion on January 1st, March 7th, March 8th, March 9th, March 26th, and November 29th.  (*See* Dep. of Def.'s R. 30(b)(6) Rep. Rhonda S. Bueche ("Bueche Dep.") 51:12–52:10, 56:18–57:9, 57:23–58:4.).

Defendant obtained credit information about Plaintiff Rhy from TransUnion at least one time in 2012.  (*See id.* 126:13–127:7.)  Defendant's inquiry of Plaintiff Rhy's credit information was posted to TransUnion on January 1st, 2012. (*See id.*)

 Defendant has a standard practice known internally as "CCBR" to regularly review or "refresh" credit information on consumers with active accounts, as is Defendant's right under the FCRA.  (*See* Bueche Dep. 5:17–11:9.)   Recognizing that discharged accounts justify no such credit reviews on the discharged consumers, Defendant's regular credit sweeps on its customers are designed to exclude consumers who discharged their obligations to Defendant.  (*See id.* 32:8–21, 34:6–19.)  As a result, Defendant's acquisitions

---

[2] Through annual requests to TransUnion for the free disclosures mandated by 15 U.S.C. §§ 1681g and 1681j, Plaintiff Germain is aware of continuing actions by Defendant to obtain his credit information and has alleged additional violations of the FCRA in 2012 and 2013 in support of his claims for individual relief.  (*See* ACAC ¶ 12.)  For the purposes of the instant Motion and determining the range of possible reasons why Defendant would obtain credit information on discharged former customers, however, Plaintiffs examined Defendant on a particular TransUnion disclosure to Plaintiff Germain dated November 29th, 2012, which identified six acquisitions of Plaintiff Germain's data between January 1st, 2012 and that date.  Those six acquisitions represent the range of impermissible purposes that gave rise to the claims of the Plaintiffs and the similarly situated consumers they seek to represent.

of credit information about Plaintiffs at issue were not driven by Defendant's regular account review or "refresh" process. (*See id.* 5:12–16, 32:22–33:3.)

Instead, Defendant's acquisitions of Plaintiffs' credit information were driven by "exception" measures specifically designed and implemented between 2008 and 2010 in response to the financial crisis. (*See* Bueche Dep. 34:6–35:4, 43:13–44:9, 58:10–59–7, 94:22–95:7.) Defendant adopted three illegal measures during this time. All three were taken against Plaintiff Germain. One was taken again Plaintiff Rhy.

### A. The ARM Process

The first illegal measure is referred to by Defendant as "ARM," short for "adjustable rate "mortgage." (*See* Bueche Dep. 58:10–59:1.) Defendant conceived the ARM process in late 2008 and implemented it in early 2009. (*See id.* 94:22–95:7, 101:20–23.) The purpose of the ARM process was to systematically review the creditworthiness of consumers with adjustable rate mortgages. (*See id.* 58:10–60:6.) Defendant wanted to "forecast" a potential increase in a consumer's mortgage payment so that it could reduce other credit it made available to that consumer. (*See id.*) The way ARM worked is that Defendant submitted requests to TransUnion to identify consumers on Defendant's customer list with an adjustable rate mortgage obligation to any lender. (*See id.* 127:21–128:1.) Defendant received hits back from TransUnion of consumers on its customer list with adjustable rate mortgages. (*See id.* 124:17–125:13.) Defendant could then decrease the credit available to those consumers. (*See id.* 107:9–19.) Defendant believes the ARM process saved it tens of millions of dollars by allowing it to deny access to credit to consumers facing increases to their mortgage payments. (*See id.* 106:25–108:6.)

The illegal part of the ARM process was that Defendant failed to exclude bankrupt former mortgagors.  (*See* Bueche Dep. 109:6–110:12, 120:1–5.)  Through the ARM process, Defendant received data back from TransUnion on consumers without regard to whether the consumers had discharged their mortgage obligations and without regard to consumers' interest in obtaining new credit from Defendant.  (*See id.*)  Defendant purpose was solely to identify consumers with adjustable rate mortgages in their credit files in order to flag those consumers for adverse treatment.  (*See id.* 58:10–60:6.)  As to discharged mortgagors, this purpose was impermissible.

Both Plaintiff Germain and Plaintiff Rhy were subjected to acquisitions of their credit information through Defendant's ARM process after they discharged their obligations to Defendant.  (*See* Bueche Dep. 125:14–127:7.)  Defendant acknowledges other complaints about obtaining data through the ARM process on bankrupt mortgagors.  (*See id.* 114:6–10, 117:8–11, 130:8–17.)  The ARM process started with 3.2 million hits from TransUnion and continued thereafter with additions and subtractions from Defendant's submission list until the process was discontinued in around February 2012.  (*See id.* 120:16–21, 124:17–23, 126:7–12.)  To identify all other discharged mortgagors who had their credit information improperly reviewed through Defendant's ARM process, Plaintiffs will need only to cross-reference the hit lists Defendant received back from TransUnion with TransUnion's bankruptcy data pertaining to the subject consumers.  (*See* TU Subpoena; *see also* Lyons Decl. June 27, 2014, ¶ 4, Ex. 3 (demonstrating, by way of example, that TU has data fields in its credit files identifying whether a consumer obtained a bankruptcy discharge and the date of the discharge.)

### B.  The Ad-Hoc Process

The second illegal measure is referred to by Defendant as "ad-hoc."  Defendant implemented the ad-hoc process in 2010 for the specific purpose of obtaining credit risk scores on consumers who were exempted from the regular CCBR credit "refresh" sweeps. (*See* Bueche Dep. 34:6–35:4, 38:6–10, 43:22–44:9.)   The only reason Defendant has identified for a consumer to be exempted from the regular credit sweeps and included in the ad-hoc sweeps is bankruptcy discharge of a mortgage owed to Defendant.   (*See id*.)

Defendant's goal with ad-hoc was to proactively screen consumers for potential eligibility for government programs that were created to help consumers avoid foreclosure. (*See* Bueche Dep. 73:17–75:16.)  The government programs require credit risk scores for approval.  (*See id.* 34:12–35:4.)  Defendant has the risk scores from CCBR on non-discharged mortgagors, but Defendant needed to implement the ad-hoc process to obtain risk scores for discharged mortgagors.  (*See id.*)   Defendant sent lists of discharged mortgagors without fresh risk scores to TransUnion, and TransUnion in turn supplied the requested risk scores.  (*See id.* 44:24–46:3.)

Defendant runs the ad-hoc process without regard to any interest from the consumer in the government programs. (*See id.* 57:6–22, 87:18–88:21.)  Defendant wants to be "proactive," and continues to run the ad-hoc process to obtain "fresh" scores for bankrupt mortgagors.  (*See id*. 35:5–22, 73:13–16, 88:13–21.)  Defendant has not identified the number of ad-hoc data acquisitions processed to date, but the number appears to be substantial.  In its report approving the ad-hoc process, Defendant estimated that it would

request credit risk scores through ad-hoc on between 30,000 and 300,000 consumers. (*See id.* 66:4–67:5.)

Defendant included Plaintiff Germain in the ad-hoc process run on March 7th, 2012, March 8th, 2012, and March 9th, 2012. (*See* Bueche Dep. 42:13–43:18, 57:6–22.) To date, Defendant has balked at characterizing the ad-hoc process as exclusively directed at bankrupt mortgagors (even while admitting that the purpose of ad-hoc was to capture risk scores for mortgagors exempted from CCBR due to bankruptcy and failing to identify another way a consumer might get included in ad-hoc). (*See id.* 34:6–35:4, 62:21–63:3.) If Defendant cannot identify any other reason for a consumer to be included in ad-hoc, all discharged mortgagors who had their credit information improperly reviewed by Defendant through the ad hoc process can be identified from the ad-hoc lists alone. (*See id.* 65:20–25.) If it turns out Defendant is correct that bankrupt mortgagors were a subset of consumers included in ad-hoc, discharged mortgagors who had their credit information improperly reviewed by Defendant through the ad hoc process can be identified by cross-referencing the ad-hoc lists with TransUnion's bankruptcy data pertaining to the subject consumers. (*See* TU Subpoena; *see also* Lyons Decl. June 27, 2014, ¶ 4, Ex. 3 (demonstrating, by way of example, that TU has data fields in its credit files identifying whether a consumer obtained a bankruptcy discharge and the date of the discharge.)

### C. Property Owners Without Current or Prospective Credit Obligations

The third illegal measure instituted by Defendant is obtaining credit reports related to property transactions in which there is no legitimate need for credit information. Separate from the ARM and ad-hoc processes, Defendant obtains credit reports on

consumers engaged in potential short sale or deed in lieu of foreclosure transactions involving Defendant's property interests. (*See* ACAC ¶¶ 15–14; Bueche Dep. 51:21–52:10, 55:13–17, 56:11–57:1.) Defendant lumps these property transactions into it general "loss mitigation" practices and conducts credit reviews on the property owners without regard to whether Defendant's interest in the transaction is connected to any current or prospective credit obligation of the owner.[3] (*See id.*)

Defendant obtained credit reports on Plaintiff Germain on March 26th, 2012 and November 29th, 2012 despite the fact that Plaintiff Germain had previously discharged his mortgage debt in bankruptcy. The only prospective transactions for which Plaintiff Germain engaged in any contact with Defendant were short sale and deed in lieu of foreclosure transactions. From the records of TransUnion and the records of Defendant, Plaintiff Germain believes he will be able to identify a set of discharged mortgagors who communicated with Defendant about prospective short sale or deed in lieu transactions and had their credit improperly reviewed by Defendant as a result.

---

[3] Plaintiffs took the deposition of Defendant's corporate representative Nadine San Antonio in California on May 21st, 2014 with regard to communications between Plaintiffs and Defendant and the interpretation of Defendant's notes. Defendant's counsel made frequent objections to statements of policy and practice offered by Ms. San Antonio as outside the scope of her corporate representative designation. Thus, Ms. San Antonio's testimony is not useful for the instant Motion directed at class certification. It is worth noting, however, that Ms. San Antonio's testimony on communications between Plaintiff Germain and Defendant was consistent with Plaintiffs' allegations regarding those communications. (*See* ACAC ¶¶ 15–16.) The testimony of Defendant's policy and practices witness, Ms. Bueche, combined with Ms. San Antonio's testimony confirming Plaintiff Germain's allegations demonstrates that Defendant had a policy and practice to lump all property transactions into "loss mitigation" and believed that such transactions justified obtaining credit reports without regard to the existence of a current or prospective credit obligation.

Plaintiffs have demonstrated knowledge and commitment sufficient to act as representatives of similarly situated consumers.  (*See* Germain Decl. ¶¶ 1–12; Rhy Decl. ¶¶ 1–12.)  Plaintiffs have no interests that would conflict with similarly situated consumers. (*See* Germain Decl. ¶¶ 10–11; Rhy Decl. ¶¶ 10–11.)  Plaintiffs have their claims, and they simply want others with the same claims to share in a favorable result.  Plaintiffs are also represented in this action by experience consumer class action counsel.  (*See* Lyons Decl. June 27, 2014, ¶ 3, Ex. 2, Curriculum Vitae.)

Plaintiffs request that the Court now certify the following classes:

*The "ARM Class"*:

All (1) consumers (2) about whom (3) Defendant (4) obtained credit information (5) after September 26th, 2011 (6) through the ARM process (7) after the consumer discharged a mortgage obligation to Defendant.

*The "Ad-Hoc Class"*:

All (1) consumers (2) about whom (3) Defendant (4) obtained credit information (5) after September 26th, 2011 (6) through the ad-hoc process (7) after the consumer discharged a mortgage obligation to Defendant.

*The "Property Owner Class"*:

All (1) consumers (2) about whom (3) Defendant (4) obtained credit information (5) after September 26th, 2011 (6) in connection with a short sale or deed in lieu of foreclosure transaction (7) after the consumer discharged their mortgage obligation to Defendant.

Based on the strength of the record described above and the argument that follows below, Plaintiffs believe the Court should grant their Motion.

## IV.  REQUIREMENTS FOR CERTIFYING A CLASS

A plaintiff seeking to certify a class must satisfy all four requirements in Federal Rule of Civil Procedure 23(a): (1) the class be so numerous that joinder of all of its members would be impracticable; (2) the class members' claims give rise to common questions of law or fact; (3) the plaintiff's claims must be typical of the class members' claims; and (4) the plaintiff and her counsel must be adequate representatives of class. *See Amchen Prods., Inc. v. Windsor*, 521 U.S. 591, 613 (1997).

In addition, a plaintiff must satisfy one of the three requirements in Rule 23(b). Plaintiff seek certification of a class under Rule 23(b)(3).  (*See* ACAC ¶ 55.)  To satisfy Rule 23(b)(3), a plaintiff must show that "common questions of law and fact predominate over individual questions and that the class action form is superior to other methods for adjudicating the controversy."  Relevant factors include (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.  Fed. R. Civ. P. 23(b)(3)(A–D).

## V.    ARGUMENT

**B. The ARM Class, Ad-Hoc Class, and Property Owner Class Satisfy All Requirements for Class Certification and, Accordingly, the Court Should Enter an Order Pursuant to Federal Rule of Civil Procedure 23(c)(1) Certifying Each Class.**

### 1.  Numerosity

A class may be certified if "the class is so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  Plaintiffs need not show that joinder is impossible, but rather that joining all members of the class would be difficult.  "[A]class can be certified without determination of its size, so long as it's reasonable to believe it large enough to make joinder impracticable and thus justify a class action suit."  *Arnold Chapman and Paldo Sign & Display Co. v. Wagener Equities Inc.*, 747 F.3d 489, 492 (7th Cir. 2014).   Further, a district court does not need to determine that there appears to be a sufficient quantity of winning claims; a court need only find it reasonably likely that the class of potential claimants is so large that joinder would be impracticable.  *See Parko v. Shell Oil Co.*, 739 F.3d 1083, 1084-85 (7th Cir. 2014) ("The defendants are thus asking us to put the cart before the horse. How many (if any) of the class members have a valid claim is the issue to be determined *after* the class is certified.") (emphasis in original).

On this record, the ARM Class, the Ad-Hoc Class, and the Property Owner Class each satisfies the numerosity requirement.  Defendant is a national bank that adopted uniform practices directed at broad segments of its customer base during the financial crisis: consumers with adjustable rate mortgages, consumers facing foreclosure, and consumers exploring short sale and deed in lieu of foreclosure transactions.  Each class of

a claimants is a group of discharged former customers of Defendant who were improperly included in Defendant's credit review processes. It is reasonably likely that the number of claimants in each proposed class will be sufficiently large to justify class treatment.

## 2. Commonality

A class may be certified if "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Courts have liberally construed commonality to require that a minimum of one issue is common to all class members. *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2556 (2011) ("'[e]ven a single [common] question' will do") (quoting 103 Colum. L. Rev. 149, 176 n. 110 (2003)). "[T]he common contention must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Bauer v. Kraft Foods Global, Inc.*, 277 F.R.D. 558, 562 (W.D.Wis. 2012) (quoting *Dukes*).

On this record, the ARM Class, the Ad-Hoc Class, and the Property Owner Class each satisfies the commonality requirement. There is a common question of liability with respect to each proposed class. For the ARM Class, was Defendant's purpose to obtain data on consumers' adjustable rate mortgages from TransUnion to forecast risk of other lending permissible where the consumers had already been discharged by Defendant? For the Ad-Hoc Class, was Defendant's purpose to proactively stockpile credit scores for potential applications for government programs permissible where the consumers had already been discharged by Defendant and Defendant's requests were not submitted as a result of any expressed interest from the consumers in government programs? For the

Property Owner Class, was Defendant's purpose to review credit information on property owners in connection with potential real estate transactions permissible where there was no current or prospective credit relationship between the owners and Defendant? With "one stroke," the Court can decide these issues and thereby decide the rights of substantial numbers of consumers. The commonality requirement is no barrier to class certification.

### 3. Typicality

A class may be certified if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The words "claims or defenses" refers to the types of claims or defenses that can be raised in courts of law as part of an actual or impending lawsuit. *Amchem Prods., Inc.*, 521 U.S. at 623 n.18 (1997). "[T]he focus is whether the representative plaintiffs' claims are based on the same legal theory and arise from the same conduct that gives rise to the claims of the other members of the proposed class." *Bauer*, 277 F.R.D. at 562.

On this record, the ARM Class, the Ad-Hoc Class, and the Property Owner Class each satisfies the typicality requirement. Plaintiffs' claims are aimed at enforcing the permissible purpose rules of the FCRA and achieving the statutory relief that is appropriate when regulated entities violate the Act. *See* 15 U.S.C. §§ 1681b and 1681n(a). Plaintiffs' claims arise from three standardized practices applied across segments of Defendant's customer base that were unfortunately directed at former customers such as Plaintiffs. As each class is defined, members of each putative class have the same claims and same interests as Plaintiffs.

### 4. Adequacy/Appointment of Counsel

A class may be certified if "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This "requirement is met when the class representative is part of the class and possess[es] the same interest and suffer[s] the same injury as the [absent] class members." *Amchem Prods., Inc.*, 521 U.S. at 625-26. The primary purpose of the adequacy requirement is to insure that there are no conflicts of interest between the named parties and the class they seek to represent. *See id.* A putative class representative must also have a "sufficient interest in the outcome." *See Bauer*, 277 F.R.D. at 562.

Courts also commonly assess the adequacy of putative class counsel under this requirement. *See Bauer*, 277 F.R.D. at 562. Rule 23(g)(1) of the Federal Rules of Civil Procedure require a court certifying a class to appoint adequate class counsel. Courts are required to consider "the work counsel has done in identifying or investigating potential claims in the action"; "counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action"; "counsel's knowledge of the applicable law"; and "the resources that counsel will commit to representing the class." *See id.* at 564; *see also* Fed. R. Civ. P. 23(g)(1)(A).

Plaintiffs satisfy the adequacy requirement for class certification. Plaintiffs have no interests antagonistic to the ARM Class, the Ad-Hoc Class, or the Property Owner Class. Plaintiff Germain is a member of all three classes, and all members stand to gain by Plaintiff Germain successfully asserting his claims. Plaintiff Rhy adds additional

representation for the ARM Class.  Plaintiffs have recently reaffirmed their commitment to pursuing their claims for the benefit of those similarly situated.

Further, Plaintiffs' counsel is experienced in successfully prosecuting consumer class actions and enforcing consumer rights laws on a mass scale.  To date in this action, Plaintiffs' counsel have successfully opposed Defendant's motion seeking premature dismissal and compiled a detailed factual record exposing Defendant's unlawful, standardized credit review practices.  Plaintiffs' counsel are adequate representatives of the ARM Class, Ad-Hoc Class, and Property Owner Class and deserving of appointment as counsel to each class under Rule 23(g)(1).

### 5.  Predominance

The predominance requirement means that "questions of law or fact common to class members predominate over any questions affecting only individual members."  The requirement is met when the questions of law and fact between the plaintiff class representatives and the class members are "sufficiently cohesive." *See Amchem Prods., Inc.*, 521 U.S. at 623 & n. 18.  The requirement is "qualitative rather than a quantitative" and "goes to the efficiency of a class action as an alternative to individual suits."  *Parko*, 739 F.3d at 1085.  The inquiry focuses primarily on common issues on liability. A. CONTE & H. NEWBERG, *CLASS ACTIONS* § 4.26 at 4-90-91 & n. 264 (4th ed. 2002) (citing cases).

The Seventh Circuit has recently observed that FCRA claims based on impermissible use of credit reports make for efficient class action litigation.  In 2006 in *Murray v. GMAC*, the Seventh Circuit took the opportunity to address "some fundamental

questions about the management of consumer class actions." *Murray v. GMAC Mortg.*
*Corp.*, 434 F.3d 948, 951 (7th Cir. 2006).  Judge Easterbrook observed that class actions
brought under federal consumer protection laws are fit for class treatment because they rely
on the same law, usually just a single count, to prosecute the claims of many consumers on
national basis.  *See id.* at 953.  Further, such claims are of a character that individual
damages are likely to be small and the primary motivation to bring a claim is—and was
intended by Congress to be—the imposition of statutory damages directed at uniform
conduct common to all potential claimants.  *See id.*

Under the reasoning of *Murray v. GMAC*, this case is predominantly a common
adjudicative exercise that should be resolved on a class basis for the ARM Class, the Ad-
Hoc Class, and the Property Owner Class.   The case involves a one count claim for each
Plaintiff and each member of each class: obtaining and using a consumer report without a
permissible purpose in violation of the FCRA.  15 U.S.C. § 1681b(f).  The members of
each class are former customers of Defendant who had their data accessed in violation of
the statute but not for reasons expected to cause substantial individual losses to each
consumer.  Thus, statutory damages directed at Defendant's uniform actions are the driving
force for Plaintiffs' claims and the claims of absent members of each class.[4]  Further, while

---

[4] *See also Stillmock v. Weis Markets, Inc.*, 385 Fed.Appx. 267, 273, 275 (4th Cir. 2010)
("[W]hile courts have properly denied class certification where individual damages issues
are especially complex or burdensome, where, as here, the qualitatively overarching issue
by far is the liability issue of the defendant's willfulness, and the purported class members
were exposed to the same risk of harm every time the defendant violated the statute in the
identical manner, the individual statutory damages issues are insufficient to defeat class
certification under Rule 23(b)(3)") (reversing denial of certification of FCRA class)
(internal citations and quotation omitted.).

Defendant may raise efficiency concerns with the need to identify the existence of factors necessary to make a consumer a member of each class, the bottom line is that the evidence of those factors exists in a few data sets controlled by Defendant and TransUnion that can be efficiently and systematically analyzed.   *See Smilow v. Southwestern Bell Mobile Systems, Inc.*, 323 F.3d 32, 40 (1st Cir. 2003) ("Common issues predominate where individual factual determinations can be accomplished using computer records, clerical assistance, and objective criteria.")   The Court should find that the predominance requirement is satisfied on the record presented here.

### 6.  Superiority

A class may be certified if class treatment is "superior to other available methods for the fair and efficient adjudication of the controversy."   Fed. R. Civ. P. 23(b)(3). Pertinent factors for determining whether class treatment is superior to other methods for resolving this controversy include (1) class members' interest in proceeding individually, (2) the extent and nature of any litigation already begun by class members, (3) the desirability of concentrating the litigation in the Western District of Wisconsin and (4) the likely difficulties in managing the action as a class action.  Fed. R. Civ. P. 23(b)(3)(A–D) *see also Mejdrech v. Met–Coil Systems Corp.,* 319 F.3d 910, 911 (7th Cir.2003) "[C]lass action treatment is appropriate and is permitted by Rule 23 when the judicial economy from consolidation of separate claims outweighs any concern with possible inaccuracies from their being lumped together in a single proceeding for decision by a single judge or jury."); *Bauer v. Kraft Foods Global, Inc.*, 277 F.R.D. 558, 564 (W.D.Wis. 2012).

In assessing whether class treatment is superior, it is also appropriate to consider the policy of the class mechanism to "vindicat[e] of the rights of groups of people who individually would be without effective strength to bring their opponents into court at all." *Amchem Products Inc.*, 521 U.S. at 617.  "The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights. A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor." *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344 (7th Cir. 1997).

Here, while there is evidence other consumers have complained of Defendant's actions, Plaintiffs are not aware of any individual lawsuits pending that overlap with the claims that Plaintiffs seek to resolve on a class basis for the ARM Class, the Ad-Hoc Class, and the Property Owner Class.  This demonstrates that there is little interest in individual control over the claims at issue.  Indeed, starting from inquiries reported to them by TransUnion that Plaintiffs found suspicious and unexplainable, the facts that Plaintiffs' have uncovered to date with respect to Defendant's actions and intentions have proved more technical and complicated than imagined.  Assaying Defendant's approach to conducting credit reviews in the financial crisis vis-à-vis the permissible purpose limitations imposed by FCRA is not an expenditure of time, risk, and resources commensurate with the individual relief that might be available if a successful individual claim is made.  The superiority requirement is satisfied here because this case neatly

emphasizes and advances the core policy of class actions to incentivize the enforcement of small value claims.

## VI.   CONCLUSION

Based on the foregoing, the Court should enter an order (1) certifying the ARM Class, the Ad-Hoc Class, and the Property Owner Class and (2) appointing the undersigned counsel to represent the same.


Dated this 27th day of June, 2014.          By: s/Thomas J. Lyons Jr.

                                              Thomas J. Lyons, Jr., Esq.
                                              **CONSUMER JUSTICE CENTER P.A.**
                                              367 Commerce Court
                                              Vadnais Heights, MN 55127
                                              Telephone:  651-770-9707
                                              tommycjc@aol.com

                                              Thomas J. Lyons, Sr., Esq.
                                              Wis. Attorney Lic. No. 1019127
                                              **LYONS LAW FIRM, P.A.**
                                              367 Commerce Court
                                              Vadnais Heights, MN 55127
                                              Telephone:  651-770-9707
                                              tlyons@lyonslawfirm.com

                                              Eric L. Crandall, Esq.
                                              Wis. Attorney Lic. No. 1001833
                                              **CRANDALL LAW OFFICES, SC**
                                              1237 Knowles Avenue North
                                              PO Box 27
                                              New Richmond, WI 54017
                                              715-246-1010
                                              consumerlaw@frontiernet.net

                                              **ATTORNEYS FOR PLAINTIFFS**