IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

JON GERMAIN and AMBER RHY,
on behalf of themselves and all others            OPINION AND ORDER
similarly situated,
                                                  13-cv-676-bbc
                Plaintiffs,

        v.

BANK OF AMERICA, N.A.,

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

In this proposed class action, plaintiffs Jon Germain and Amber Rhy contend that defendant Bank of America, N.A. violated the Fair Credit Reporting Act, 15 U.S.C. §§ 1681-1681 by obtaining their consumer reports without a permissible purpose after plaintiffs had discharged their mortgages with defendants in bankruptcy. Plaintiffs argue that because their credit relationship ended with defendant as soon as their mortgages were discharged, defendant had no legitimate reason to obtain their consumer reports. Defendant contends that it did have a legal purpose for each review it made of plaintiffs' consumer reports and, for that reason, was not in violation of plaintiffs' rights under the Act.

Plaintiffs seek to certify three classes under Fed. R. Civ. P. 23(b)(3), corresponding to the three different reasons defendant asserts as authority for its review of plaintiffs' consumer reports: (1) a class of plaintiffs who had adjustable rate mortgages but whose

1

debts had been discharged in bankruptcy; (2) a class of plaintiffs who were subject to defendant's "ad hoc" policy of reviewing all accounts for which it lacked recent consumer report data; and (3) a class of plaintiffs who undertook post discharge "loss mitigation" activities such as seeking a deed in lieu of foreclosure.

Generally, courts decide certification before summary judgment, but my review of defendant's motion for summary judgment reveals that plaintiffs' claims lack merit, which means plaintiffs are not proper class representatives. Therefore, I conclude that summary judgment should be decided before I take up the question of certification. Wiesmueller v. Kosobucki, 513 F.3d 784, 786 (7th Cir. 2008) ("[T]he fact that a suit lacks merit does not 'moot' the question of class certification . . . . Which is not to say that the district judge may never dismiss a case on summary judgment without first ruling on the plaintiff's motion to certify a class."). Although this procedure might prejudice defendant because it means that potential class members may still raise claims against defendant, it was defendant's choice to move for summary judgment without asking the court delay a decision until the issue of certification had been resolved. Cowen v. Bank United of Texas, FSB, 70 F.3d 937, 941 (7th Cir. 1995) ("The bank elected to move for summary judgment before the district judge decided whether to certify the suit as a class action. This is a recognized tactic . . . and does not seem to us improper.") (citations omitted).

I conclude that plaintiffs have failed to show that defendant ever obtained plaintiffs' consumer reports without a legal purpose and that summary judgment must be granted in favor of defendant. It follows, therefore, that plaintiffs are not proper class representatives

and that their motion for class certification must be denied.

From the parties' proposed findings of fact, I find that the following facts are undisputed.

## UNDISPUTED FACTS

### A. Defendant Bank of America

Defendant Bank of America, N.A. maintained three policies at issue in this lawsuit. First, it obtained consumer reports from a consumer reporting agency, TransUnion, for all customers who had adjustable rate mortgages to see how extended such customers were on credit and to determine their ability to pay their mortgages. Defendant did this without regard to whether the consumer's debt had been discharged in bankruptcy. Second, defendant obtained consumer reports from TransUnion on an "ad hoc" basis with respect to individuals for whom it did not have a recent credit score; these individuals included customers whose mortgages had been discharged in bankruptcy. Defendant included these individuals so that it could determine their eligibility for loan modification and loss mitigation programs. Third, defendant reviewed the consumer reports of customers whose mortgages had been discharged but who were in "loss mitigation" and attempting to avoid foreclosure through measures such as a deed in lieu of foreclosure.

### B. Plaintiff Jon Germain

In December 2004, plaintiff Jon Germain entered into a mortgage agreement for the

purchase of real estate. In or around 2005, Germain went into default on this loan; in 2007, the loan servicer initiated foreclosure proceedings against Germain. In October 2008, Germain filed for chapter 7 bankruptcy in the District Court for the Western District of Wisconsin. Germain's mortgage was discharged on February 19, 2009, along with other debts. In September 2010, defendant became the servicer on the loan and it re-initiated foreclosure. That action was dismissed in December 2010.

On January 1, 2012, defendant conducted an account review, which included review of Germain's consumer report. It was defendant's practice to conduct this type of review on all customers with adjustable rate mortgages in order to determine their creditworthiness in the event their mortgage payment increased. On March 7, 8 and 9, 2012, defendant reviewed Germain's consumer report as part of its "ad hoc" policy and also to determine his eligibility for loan modification programs. On March 14, 2012, defendant initiated foreclosure proceedings against Germain for the third time. On March 19, 2012, Germain proposed a deed in lieu of foreclosure. Defendant checked Germain's consumer report to determine his eligibility for loss mitigation programs related to this proposal. Subsequently, Germain informed defendant that he no longer wanted to pursue that alternative, and, on May 2, 2012, defendant denied Germain's proposal for a deed in lieu of foreclosure.

On September 17, 2012, Germain and defendant began court-ordered mediation over the foreclosure dispute. On November 29, 2012, the parties attended mediation and defendant reviewed Germain's consumer report. On December 26, 2012, defendant received and processed Germain's new proposal for a deed in lieu of foreclosure. (Plaintiff Germain

denies that he sent the proposal on this date but does not identify an alternative date.) On December 27, 2012 and February 19, 2013, defendant reviewed Germain's consumer report because its computer system identified Germain as being in "loss mitigation" related to the deed in lieu of foreclosure request. On April 9, 2013, defendant accepted the deed to Germain's property in lieu of foreclosure and the property was transferred to defendant.

Germain suffered no actual harm as a result of defendant's reviews of his consumer report.

### B. Plaintiff Amber Rhy

On October 30, 2009, plaintiff Amber Rhy filed for chapter 7 bankruptcy in the District Court for the Western District of Wisconsin. In her bankruptcy petition, she stated that she intended to retain the mortgaged real estate and make payments on the loan. On February 18, 2010, the bankruptcy court discharged Rhy's debts, including a mortgage serviced by defendant. On March 22, 2010, defendant moved to reopen the foreclosure proceeding against Rhy. (Neither party says when the foreclosure proceeding was initiated.) Rhy contested the foreclosure. On January 1, 2012, defendant reviewed Rhy's consumer report to determine her creditworthiness and the risk associated with her mortgage so that defendant could engage in loss mitigation. Plaintiff maintains possession of the real estate, and the property has not been transferred to defendant.

Rhy suffered no actual harm as a result of defendant's reviews of his consumer report.

5

OPINION

A. Summary Judgment

Plaintiffs assert that defendant violated the Fair Credit Reporting Act, 15 U.S.C. § 1681b(f), under which it is unlawful to "use or obtain" a consumer report for any purpose not authorized by the Act. Gelman v. State Farm Mutual Automobile Insurance Co., 583 F.3d 187, 191 (3d Cir. 2009); Cole v. U.S. Capital, 389 F.3d 719, 731 n.14 (7th Cir. 2004). "The term 'consumer report' means any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for—(A) credit or insurance to be used primarily for personal, family, or household purposes; (B) employment purposes; or (C) any other purpose authorized under section 1681b of this title." § 1681a(1). Section 1681b(a) of the Act allows entities to use or obtain a consumer report if the entity:

> (A) intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review or collection of an account of, the consumer; or
>
> \* \* \*
>
> (F) otherwise has a legitimate business need for the information--
>
> (I) in connection with a business transaction that is initiated by the consumer; or
>
> (ii) to review an account to determine whether the consumer

continues to meet the terms of the account.

The parties agree that defendant obtained plaintiffs' consumer reports, so the only question is whether defendant did so for a permissible statutory purpose. Godby v. Wells Fargo Bank, N.A., 599 F. Supp. 2d 934, 938 (S. D. Ohio 2008) ("[C]ourts have found that a plaintiff must establish three elements in order to sustain a claim of improper use or acquisition of a credit report:  (i) that there was a 'consumer report' within the meaning of the statute; (ii) that the defendant used or obtained it; and (iii) that the defendant did so without a permissible statutory purpose."). (Defendant has moved for summary judgment on the ground that plaintiffs cannot show that it acted willfully to violate the Act. Because I conclude that plaintiffs have not shown that defendant violated the Act, I need not consider this issue.)

Plaintiffs take the position that defendant did not act with a permissible purpose because its right to obtain their reports ended with the discharge of their mortgages, when they were no longer personally liable for their debts. They contend that defendant had no reason to review plaintiffs' consumer reports under § 1681b(a)(3)(A), which provides that banks may review consumer reports "in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review or collection of an account of, the consumer," because defendant was no longer extending credit to or collecting a debt from them; and that defendant had no legitimate purpose to review their consumer reports under § 1681b(a)(3)(F), which provides that a bank may review consumer reports "in connection with a business transaction that is

initiated by the consumer" or to review an account to determine whether the consumer continues to meet the terms of the account" because once plaintiffs' mortgages were discharged in bankruptcy, "[t]here were no credit transactions contemplated between the parties, nor was there an account upon which to collect." Godby, 599 F. Supp. 2d at 938.

For its part, defendant says that it is permitted to obtain a consumer report under § 1681b(a)(3)(A) if, during discharge, any loan modifications contemplated by the parties relate to the collection of an account. Further, defendant says, discharge of the plaintiffs' mortgages in bankruptcy did not end its relationships with plaintiffs because it had liens on plaintiffs' properties and plaintiffs contested the relinquishment of their properties to defendants; thus, their credit relationship qualified as "accounts" that defendant was permitted to review by obtaining consumer reports under § 1681b(a)(3)(A) and § 1681b(a)(F).

Defendant's argument rests on its assertion that under the Fair Credit Reporting Act, borrowers have accounts with their lenders after discharge of a debt. "Account" appears to have multiple meanings under the statute. In the "definitions" section, § 1681a, "account" is used both as "account under an open end credit plan" and as an "asset account" that does *not* include "open end credit plans." The latter meaning appears to apply exclusively to the sections of the statute dealing with credit cards and debit cards. In any case, neither of these definitions would resolve the questions in this litigation, so I turn to the relevant section of the statute itself: § 1681b(a)(3)(A), (F).

Construing the term "account" with the terms around it, such as "credit transaction,"

8

"extension of credit," and "collections" in § 1681b(a)(3)(A) and "business transaction" and "terms," in § 1681b(a)(3)(F), suggests that an "account" is the result of a business or credit transaction in which the parties enter into a credit relationship. Plaintiffs concede the probability that "account" includes a relationship in which money or property is owed, but they contend that with respect to § 1681b(a)(3)(A), the account must have resulted from "a credit transaction involving the consumer" and, with respect to § 1681b(a)(3)(F), the review of the account must relate to whether the consumer continues to be in compliance with the terms of the account, so it must include only active accounts.

I turn then to the question whether defendant obtained plaintiffs' consumer reports as a the result of "a credit transaction involving the consumer." Plaintiffs cite Pintos v. Pacific Creditors Association, 605 F.3d 665, 670 (9th Cir. 2010), as support for their position that plaintiffs were not "involved" in a credit transaction with defendant under § 1681b(a)(3)(A). In Pintos, the court held that the transaction at issue did not "involve" the plaintiff because the defendant was a towing company who had obtained the plaintiff's consumer report after the plaintiff's car was towed and sold without her permission. That situation is far different from plaintiffs' situation, in which they voluntarily entered into mortgage loans and then failed to make payments.

However, plaintiffs maintain that "credit transaction involving the consumer" must refer to defendant's present purpose for obtaining their consumer reports under § 1681b(a)(3)(A). In other words, it was proper for defendant to obtain a consumer report when the mortgage was initiated but not to obtain it again unless there was a new credit

9

transaction between the parties. It is doubtful that the statute requires a new credit transaction because it refers to both the extension of credit and the review or collection of the account, but, even if the statute had this requirement, the anticipated transactions after discharge qualify as "credit transaction[s] involving the consumer." Loan modifications and alternative agreements for debt fulfillment (such as deeds in lieu of foreclosure) are distinguishable from the circumstances in Pintos in which the towing company's only prior involvement with the plaintiff was to impound her car. With loan modifications, the lenders may investigate borrowers' creditworthiness for the benefit of the consumer and for resolution of a debt the consumer accepted voluntarily, even when the consumer did not initiate the transaction. After discharge, the consumer is no longer indebted on the *loan*, but he is indebted to *the extent of the collateral* (the mortgaged property). Because the discharged debtor retains this obligation and took it on voluntarily, his situation is distinguishable from the involuntary transaction in Pintos. It "involves" the consumer under § 1681b(a)(3)(A).

Plaintiffs argue that the account must be an active one under § 1681b(a)(3)(F) because that section requires the lender review the account to determine whether "the consumer continues to meet the terms of the account." Plaintiffs cannot cite any part of the statute for support on that point and the case law is not in their favor. Levine, 554 F.3d 1314, 1318 (11th Cir. 2009)("[W]e cannot say that the term 'account' necessarily means 'an open account.' Nor have judicial opinions established that the Act forbids the sale of reports for consumers whose accounts are closed.").

Moreover, plaintiffs do not show that determining compliance would be relevant only

for nondischarged accounts. After a chapter 7 discharge, the consumer is not personally liable for the loan, but he or she still "owes" the lender in the form of the property (the collateral). 11 U.S.C. §§ 726-27. In other words, the consumer must either make new arrangements with the lender to keep the property, return it to the lender or wait for it to be foreclosed upon. Thus, until the borrower fulfills his debt, he has a credit relationship in the form of an obligation to the lender, even after discharge. In plaintiff's situation, the bank continued to act as a lender and continued to face significant risks that depend on the consumer's ability to pay and his creditworthiness. In those circumstances, review of the account to determine whether the consumer is meeting the terms is relevant to defendant's legitimate business purposes.

I conclude that discharge of a debt alone does not extinguish defendant's right to obtain plaintiffs' consumer reports. Until the borrower has fulfilled his debt obligation, lenders may still use the borrower's consumer report to review the account. This conclusion does not dispose of all the issues raised by plaintiffs' suit. It remains necessary to decide individual questions about the status of plaintiffs' obligations to defendant and whether defendant reviewed the account for legitimate purposes.

Before I address those questions, I note that there is little case law on the question of the effect of a discharge on a lender's rights to obtain consumer reports, but two district courts have held that discharge of a debt extinguishes the lender's rights in this regard. In Godby, 599 F. Supp. 2d at 942, the court held that the defendant did not have a "legitimate business need" for the plaintiff's credit information and that the account review could not

have been conducted "in connection with a transaction initiated by the consumer" because the only transaction between the parties initiated by the plaintiff was the mortgage loan and that had been discharged in bankruptcy. In Barton v. Ocwen Loan Servicing LLC, No. CIV. 12-162 MJD, 2013 WL 5781324, at *4 (D. Minn. Oct. 25, 2013), the court held that once the lender learned that the debt had been discharged or had been given the name of the borrower's bankruptcy attorney to verify the discharge, it had no permissible purpose to review the borrower's report. At that point, no credit relationship existed and the lender had no basis for a good faith belief that a credit relationship continued to exist.

I find the reasoning in these cases unpersuasive. In Godby, the court relied heavily on cases that did not involve a mortgage or circumstances similar to those in this case. For example, the court relied on Duncan v. Handmaker, 149 F.3d 424, 426 (6th Cir. 1998), which involved the defendant's review of the plaintiff's consumer report after the plaintiff sued on a matter unrelated to the mortgage or debt (the plaintiff accused the defendant's clients of failing to inspect the property before closing on the loan). That situation is distinguishable from one in which a borrower remains obligated to the creditor as is the case for plaintiffs. The court also relied on Smith v. Bob Smith Chevrolet, Inc., 275 F. Supp. 2d 808, 816 (W.D. Ky. 2003), in which the defendant sought a consumer report to verify the value of its collateral by determining whether the plaintiff was making payments on the collateral, for which it had no loan with the defendant. In Smith, the court held that the purpose for obtaining the consumer report did not come under § 1681b(a)(3). Smith is distinguishable from this case on its facts. In this case, defendant was seeking information

about borrowers to determine whether they would qualify for loan modifications on its loans with the borrowers.

Moreover, in both Godby, 599 F. Supp. 2d at 942, and Barton, 2013 WL 5781324, at *4, the courts did not address the questions whether a credit relationship continues after discharge when there is a continuing involvement of the consumer, such as when the consumer retains possession, seeks loan modifications or contests foreclosure. In Barton, 2013 WL 5781324, at *4, the court did not explore the ramifications of the plaintiff's request for a short sale and her continuing possession of the mortgaged property with respect to her Fair Credit Reporting Act claim.

Because I conclude that issues beyond the discharge of the debt must be considered in order to determine whether defendant violated the Fair Credit Reporting Act, I will take up each plaintiff's circumstances.

Germain had an adjustable rate mortgage, retained possession of his home and was contesting foreclosure after a chapter 7 discharge of his mortgage loan. Although such a discharge ends a borrower's personal liability for the loan, it does not eliminate the mortgage lien, which means that so long as another agreement is not reached and the borrower does not make his or her mortgage payments, the creditor may foreclose on the property. 11 U.S.C. §§ 726-27. Because Germain remained in possession of his property, he remained responsible to make payments or face foreclosure. Either option posed risks to defendant: in the first instance, Germain might be unable to make his payments; and, in the second instance, foreclosure involved costs and potential losses for defendant. Because Germain still

13

held an obligation to defendant from the credit that defendant had extended to him, I conclude that a credit relationship and "account" existed between them. Therefore, it was permissible under the Fair Credit Reporting Act for defendant to obtain Germain's consumer report to review his account. §§ 1681b(a)(3)(A), (F).

Further, for each consumer report review it conducted, defendant has either provided a reason for reviewing Germain's account under § 1681b(a)(3)(A) or an assertion that it reviewed the account to determine whether Germain was in compliance under § 1681b(a)(3)(F). It reviewed Germain's consumer report in January 2012 because his mortgage had an adjustable interest rate and defendant sought to evaluate its risks by determining the creditworthiness of a customer whose rate might fluctuate. Although Germain had discharged the mortgage loan, the existence of the lien meant that he was still required either to make those payments or to hand over the real estate, giving defendant a legitimate reason to evaluate his ability to pay using his consumer report. Later, in March 2012, defendant obtained Germain's consumer report in order to determine whether he qualified for any loan modification programs, including the federal government's Home Affordable Modification Program. Loan modification involves an agreement between the parties on alternative terms for the borrower to fulfill his preexisting obligation to the lender. In this situation also, defendant had a legitimate reason to determine Germain's present creditworthiness.

On March 26, 2012, December 27, 2012 and February 19, 2013, defendant obtained Germain's consumer report because Germain had asked defendant to accept a deed in lieu

of foreclosure on his property. Because this transaction also posed risks for defendant, if, for example, Germain had taken out other loans on the property, it was permissible for defendant to determine the extent to which Germain had extended his credit as well as his compliance with the account. Finally, on November 29, 2012, defendant obtained Germain's consumer report when defendant and Germain were in mediation to resolve their dispute over foreclosure. Because the parties remained in negotiation over resolution of Germain's obligations, defendant had a legitimate reason to know Germain's compliance with the account, his present ability to pay and his creditworthiness.

Defendant obtained plaintiff Rhy's consumer report on January 1, 2012, nearly two years after her debts had been discharged in bankruptcy. Defendant says that it obtained the report to determine Rhy's eligibility for loss mitigation measures. As of January 2012, Rhy remained in possession of the property, was contesting the foreclosure on her home and had stated that she intended to make payments in order to remain in possession. Like plaintiff Germain, Rhy was still obligated to defendant for money owed on the collateral, although not on the loan. Because she continued to be in a credit relationship and "account" with defendant and intended to make payments, defendant had a right to review the account under § 1681b(a)(3)(A) to assess Rhy's creditworthiness and ability to pay.

Accordingly, I conclude that plaintiffs Germain and Rhy have not shown that defendant violated the Fair Credit Reporting Act on any of the occasions on which it obtained their consumer reports.

B. Certification of Class Action

Plaintiffs have moved for certification of their lawsuit as a class action. They propose three subclasses, based on defendant's policies for reviewing consumer reports: (1) a class of plaintiffs who had adjustable rate mortgages but whose debts had been discharged in bankruptcy; (2) a class of plaintiffs who were subject to defendant's "ad hoc" policy of reviewing all accounts for which it lacked consumer report data on a periodic basis; and (3) a class of plaintiffs who undertook post discharge "loss mitigation" activities such as seeking a deed in lieu of foreclosure for whom defendant pulled a consumer report.

To certify each subclass, plaintiff must show "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). In addition, because plaintiffs seek to certify their subclasses under Fed. R. Civ. P. 23(b)(3), they must show that "common questions of law and fact predominate over individual questions and that the class action form is superior to other methods for adjudicating the controversy" and that a class action is "superior" to other methods of adjudication.

Although commonality, typicality and predominance are separate factors under the rules, the analysis of these factors tends to merge into one question: whether the proposed class is "sufficiently cohesive to warrant adjudication by representation." Amchem Products, Inc. v. Windsor, 521 U.S. 591, 623 (1997). See also Telephone Company of the Southwest

v. Falcon, 457 U.S. 147, 157 n. 13 (1982) ("The commonality and typicality requirements of Rule 23(a) tend to merge."); Messner v. Northshore University HealthSystem, 669 F.3d 802, 814 (7th Cir. 2012) ("While similar to Rule 23(a)'s requirements for typicality and commonality, the predominance criterion is far more demanding.") (internal quotations omitted). Plaintiff argues that there is sufficient cohesion with respect to all of the classes because the questions addressed by the litigation are the same: (1) Are post discharge reviews of consumer reports allowed under the Fair Credit Reporting Act?; and (2) Were defendant's policies a willful violation?

Plaintiffs make a compelling argument that the consumer report distributor TransUnion could determine which consumers qualify for any of the subclasses by cross checking information it already had. However, even if the plaintiffs who qualify for each class may be identified easily, the questions proposed by plaintiffs are too general to resolve their litigation. With respect to the first and second subclasses, simply asking whether a bank may obtain consumer reports for those who have discharged their loan debt does not advance plaintiffs' claims. The answer to that question is "It depends." In other words, resolution of those common questions does not resolve the litigation. Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2551 (2011) ("[The] common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.").

As discussed above, the precise nature of the post discharge relationship must be

17

determined with respect to each consumer. Were the consumers in possession of the property? Were they contesting foreclosure? Did they inform the bank that they wanted to modify their loans or make payments to stay in possession? The answers to such questions are necessary to determine whether the bank and the class members continued to have a credit relationship and "account" for which review of their consumer reports would be permissible under § 1681b(a)(3)(A) or (F). Furthermore, it would be necessary to review the circumstances of each instance in which the lender obtained the consumer report to determine whether the lender did so "in connection with a credit transaction," § 1681b(a)(3)(A) or "to determine whether the consumer continues to meet the terms of the account." § 1681b(a)(3)(F). These individualized questions predominate over the common ones for these subclasses. Fed. R. Civ. P. 23(b)(3).

With respect to the third subclass, many of the individual questions discussed above have already been answered (e.g., "yes, the class member is contesting foreclosure and attempting to obtain a deed in lieu of foreclosure"). However, "loss mitigation" is a broad category. Answers to specific questions about the risk posed to the lender and the intentions of the borrower are necessary to allow the court to determine whether a credit relationship and "account" existed between the parties. Therefore, it appears likely that individualized questions predominate over common ones for this subclass as well.

The biggest obstacle for plaintiffs with respect to this subclass is that they are not good representatives. "A decision that the claim of the named plaintiffs lacks merit ordinarily, though not invariably . . . disqualifies the named plaintiffs as proper class

18

representatives." Cowen, 70 F.3d at 941 (citations omitted). Plaintiffs' circumstances foreclose their claims on the merits under my reading of the Fair Credit Reporting Act. To be effective class representatives, plaintiffs' interests must align with those of all the prospective class members. I have determined that they have no viable claims against defendant. Without any adequate class representatives, class certification must be denied.

ORDER

IT IS ORDERED that

1. Defendant Bank of America, N.A.'s motion for summary judgment, dkt. #47, is GRANTED.

2. Plaintiffs Jon Germain's and Amber Rhy's motion for class certification, dkt. #40, is DENIED.

3. The clerk of court is directed to enter judgment for defendant and close the case.

Entered this 7th day of November, 2014.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge